Good afternoon, and may it please the Court, Tracy Morita for Appellants Christopher Chung, Samantha Critchlow, and Stephen Kardash. Your Honors, this case can be decided on the second prong of qualified immunity. Brian v. McPherson and the Matos-Brooks case cited by Appellee do not squarely govern the facts in this case, nor do they establish, beyond debate, that the officer's use of intermediate-level force here violated a clearly established right. Therefore, based on the status of the law on March 16, 2015, every reasonable officer would have believed that it was constitutionally permissible to utilize intermediate-level force on a non-compliant suspect in the middle of a busy six-lane roadway who was— Now, busy six-lane roadway, what was the circumstance at the actual time of the event? Had traffic been stopped? I know that one of the officers had radioed asking for help that it be stopped. Had it, in fact, been stopped? At the time, and this is from the Court's order, if we just go by the findings of fact from the order, that traffic was stopped, and I think this is obviously based on the traffic was not—we would submit that traffic was not being obstructed, there was no officer out there waving cars or having flares out or some kind of blocking. But doesn't the record indicate that there, at least at the time of this incident, traffic wasn't coming through this part of the thoroughfare? And again, if we view—obviously, we would have a different point of view, but viewing the light— Most favorable, most favorable to your opponent. Absolutely. The testimony by one of the officers is that, yes, traffic, by their own volition, that motorists had stopped and were— Okay, so does that change your argument? Let's assume taking the light, facts in the light, was favorable. There was—you didn't have to use force to get him out of the way of traffic. That removing this person from the flow of traffic was not a justification under this set of facts. Focus instead on the other factors. Why do they allow the use of intermediate force? He's not armed, not threatening under individuals. What's the justification for the use of intermediate force under those circumstances? Well, if we look at the facts, and again, so yes, conceding that he's on—it's tough for me to concede— No, I mean, it may well be that if you went to trial, you'd win on that issue, but at least there's—looking at the summary judgment record, it appears that the traffic issue had at least been temporarily solved, so— Well, could I also submit, though, that officers that come to the scene later say that there were cars moving through the Mackay side, Ocean side of the lane, and that there were cars—that there were cars backing up, and so, you know, we can't—we're talking about what those front cars are doing, but we won't concede that there aren't cars that can't go around. They're at an intersection, so there's another—there's the intersecting street, cars, you know, an impatient driver wants to go through, doesn't understand what's going on. All they know is they see a green light. Well, so what you're saying is, you know, the traffic—I forgot, what time was it? 8.15 at night. 8 p.m. So the traffic was somewhat congested, maybe snarled, it hadn't been stopped, maybe part of it was stopped by the police, part of it voluntarily, but still, you know, the intersection was in effect, or the street was not operating, see? So I mean, that's the situation, all right? So take it from there. So what—you know, there's no emergency, right? Well, so basically, these—Mr. Halleck, he's disobeying officer commands. They're saying, get on the sidewalk, get on the sidewalk. That doesn't work. They say for about two minutes they're trying to grab him, but he keeps, you know, running away so they can't get a hold of him. So then they're giving him verbal warnings, multiple verbal warnings. We're going to deploy pepper spray. They eventually deploy the pepper spray multiple times, and that is ineffective, you know? For whatever reason, it has no effect. It doesn't help to incapacitate him or help them to gain control. He's still running back and forth. So then at that point, they give—Officer Chung gives two verbal warnings. I'm going to deploy, you know, my taser if you don't get onto the sidewalk. He repeats himself. He says it again, and then he deploys the taser. And I guess what would happen in a normal or best-case scenario when you deploy a taser, the prongs stick in to the suspect, and then there's a temporary five-second burst, and then they fall because they're, you know, incapacitated. The large muscle groups contract and they fall. That did not happen in this case. So then he pauses, reloads the taser, and about a minute and 40 seconds goes by, and we see that because we see it on the taser log. And then another officer comes on scene, tries to—in that time, I guess when he's reloading the taser—tries to do the same. So the question is, what's the need for all these taser shots? Well, they can't get a hold of him. They're trying to— I know that, but still, why did they have to get a hold of him? They were hurting him sort of away, right? Well, the reason that Officer Chung comes to the scene is dispatch— The question is, what's the need? Tell me what the need was. Well, he is dispatched—he's sent there by dispatch to say—saying there's a man in the middle of the road. He, you know— So— He's there to get him off the road. So if someone is standing in the middle of the road, stopping traffic, but not harming any other person, that's a natural taser target, is that what you're saying? So if we look at— Is that—is that what you're saying? You can tase somebody because they're standing in the middle of the road? Absolutely not. Multiple times? Absolutely not. All right, then what's the reason? That's what he was doing, standing in the middle of the road. So what's—and, you know, not—not obeying commands to do this and do that, you know, what—that's what indications call passive resistance. Now what is the need for multiple, you know, dart mode taser shots to a person like that? We would submit that this isn't passive resistance, that it's—it's resistance. Passive resistance would be, you know, just somebody laying on the ground or, like, protesters not reacting, but this—in this case, he's physically running, disobeying officer orders, and running back and forth away from the officers in the middle of the road. Right. And so— So what are they trying to do? Teach him a lesson? No. Absolutely not. Absolutely not. And in this case, they—they warned him, right? They gave—they issued the warnings, we're going to tase you if you don't move to the sidewalk. Now, can you—can you cite any case with the facts anywhere close to this where the court said, you know, multiple dart mode taser shots were—were a reasonable response? I can. In this—in this circuit, Jones versus Las Vegas Metro Police Department, and this comes after, you know, the facts in this case, this court—this court, this decision was from October 20th, 2017, but in that case, an officer pulled over, routine traffic stop, pulled over this suspect, ordered him out of the car to pat him down for weapons. He obeyed. Then he started to turn toward the officer, and in this case, similar to this—in Jones, similar to this case, there's a large—I guess there's a size discrepancy, and so the officer said the plaintiff was much larger. He actually drew a firearm at first, pointed it at Jones, and ordered him to turn back around. So Jones then sprints away, and the officer calls for backup. In the meantime, he pursues Jones and with—picks out—pulls out his taser and used it to subdue him. And the court, the Ninth Circuit, found in that case, based on these facts, the officer believed something less than deadly force was justified, so he used his taser to subdue Jones. This decision was consistent with our case law as we've held, that the use of tasers can be intermediate force. Using a taser to stop Jones and place him under arrest was reasonable under the circumstances. And that was a routine traffic stop. But wasn't that—as I recall, Jones, and I may not recall it correctly, it was a case in which the officer was trying to arrest someone for having committed a crime. It may have been a traffic violation. And the person threatened the officer, in effect, by turning towards him, and then fled. That's not this case, is it? I think this case is—I think there's less compliance and more resistance in this case. Well, there may be—what resistance—there's no threat to the officers here. In Jones, the officer is right next to the defendant, if you will, the petitioner. And the petitioner—the officer has some reasonable fear that if the guy doesn't listen to his commands, they maybe end up being in some sort of physical confrontation. And then he apparently has cause to arrest or detain him, and he runs away. Isn't that different in this case, where you've got what's clearly a mentally disturbed guy in the middle of the road, and he gets pepper-sprayed a whole bunch of times and tased twice? Well, actually, in Jones, it's the court—I mean, from the opinion, it says he sprinted away. The officer calls for backup and pursued Jones. So he's pursuing him, and then he decides to deploy his taser to stop him from fleeing. And then, you know—and again, similar to this case— Was somebody pursuing Mr. Silva in this case? Yes. Officer Chung gets there, and about a minute later, Officer Critchlow— No, I understand. My understanding was they weren't pursuing him so much as they were trying to herd him towards the sidewalk. He wasn't running away, was he? Well, we would submit that he's—they're trying to, like I said, for two minutes, they're trying to grab him, you know, to— No, I understand. You may be trying to equate them. That's not what I'm asking. He wasn't running away, was he? We would submit that he is. He's fleeing back. One officer would come close to him, then he's running in the other direction, and another officer's there. And part of this, you know, we can't dismiss the size disparity. Officer Critchlow, it's in the record, she's five feet tall and 130 pounds. And then Officer Chung, it's also in the record that he's substantially smaller than Mr. Halleck, and they're both getting fatigued. At the end of this, Officer Critchlow testified that she was out of breath and, like, drenched in sweat. And so that's definitely something, you know, that factors into all this, because they're not left with many options. The pepper spray isn't working. And so, I mean, other than let him just, you know, run off and continue running in the road, or I know you want me to ignore that, but they had to do—they had to use, you know, some kind of force. I mean, obviously not lethal force, but in this case— Is there a distinction among your clients in this case? You don't argue it in debriefs, but is there— I think it's set forth very well in the amicus brief, you know, where they—absolutely, there's pepper spray and then there's a taser. We would submit they're both intermediate levels of— Well, I know, and that's why I'm asking you—so you submit there's no difference among your clients. One of the amici says, well, maybe not. Maybe the guy who shoots the taser has a higher level of responsibility than those who just use the pepper spray. Absolutely. I mean, obviously the court—you know, they're both in that category, but it feels that there's a visceral reaction to the taser, so if there is—you know, it's not going to be based on the case law. As I said, there's no case that says you can't—there's no case that says, okay, you can use intermediate taser and then intermediate pepper spray in different circumstances, but if that's what we're looking at— Although we just know tasers kill people and pepper spray doesn't. You know, that's— Tasers don't usually kill people, but there's enough evidence that they kill people that—well, for purposes of law, they're an intermediate level of force. Anyone familiar with tasers knows that you get some fatalities. If there's—you know, we would submit that that's not the situation in this case and that— I'm not describing the situation in this case. I'm just saying that we know that tasers sometimes kill people. And if that's the new law that, you know, the Ninth Circuit wants to make today, that hey, a taser is absolutely—you know, you can't use a taser on a suspect that is, you know, like a misdemeanor suspect or a suspect that doesn't have a deadly weapon, then, you know, that's for the court to decide, but that would be new law. And so we would submit that, based on the facts in this case, that that law was not clearly established on March 16, 2015, and so the court's order should be— So your position is that we should treat all three defendants the same way? No. In the best interest of my clients, I mean, obviously, it's in their declarations. Samantha Critchlow, you know, and Stephen Kardash could not have stopped Officer Chung from deploying his taser, even if they had wanted to. I'd like to reserve time for rebuttal. Why don't you save some time? Sure. Good afternoon. May it please the Court, Eric Seitz appearing for the plaintiff appellee in this case. This is a rare situation for me because I'm normally the appellant, but I prefer to be in this situation, in this case, for reasons I'm sure you understand. Here the trial judge, looking at the facts in the light most favorable to the non-moving party, found significant factual disputes that did not enable her to determine whether the officers were entitled to qualified immunity. That in a case where qualified immunity was not asserted at the outset, we did a lot of You have in the record the depositions of the officers. You have expert reports. You have an enormous record here, and despite that, the judge found that there are significant facts that she couldn't resolve for the purpose of determining whether qualified immunity existed or whether it didn't, and she had cross motions on that issue. I don't think that anything has been presented to you, one, that warrants this appeal, or two, that certainly warrants that that finding be set aside or altered in any respect. I do not agree that there is any basis for differentiating these three police officers and their actions, and let me say that originally, if you look back, you'll see we sued at least two other officers who were there at the scene, and we dismissed the cases against them after we took their depositions. But these three officers all utilized a form of intermediate force. And you wouldn't make any distinction between the two forms? No, not in this case. Well, but Let me explain that. Let me just work with you for a second on this. Sure. We have two officers, the two other defendants, not Detective Chung or Officer Chung, who are trying to move this, move your client away by, or get him to go to the sidewalk by pepper spraying him, and it doesn't work. And except for a moment, Judge Fletcher's description that while it's an intermediate use of force, a taser is a more dangerous use of force. We have done it for having very many cases that I've seen where somebody dies from pepper spray. There's no distinction to be made between the two of them? No, because this court, for a long time now, has classified both levels of force as intermediate, and in both instances has required the officers, by virtue of their training and the regulations that are in effect, to utilize a process of determining whether that force is appropriate. And the criteria are the same. And in this case, as you've seen, and as I believe is the case here, there's no evidence that Mr. Halleck was committing a serious offense. There's no allegation that he was actively resisting or attempting to run away. He wasn't adhering to their commands. In our view, he wasn't able to understand their commands, because he was under- Well, runaway is a hard word here. He's not simply fleeing, but he's certainly taking, I'll say, an evasive action. That's running away. He's not just fleeing like, I'm out of here, but he's certainly not saying, oh yes, please take hold of my arm and escort me to the sidewalk. No, he's not. But in the cases where that factor has arisen, starting, I would submit to you, with Graham versus Connor, it is within the context that you have a dangerous person who is running away and poses a risk to the public of committing other crimes. And for that reason, you may need to shoot him with a taser or a gun, because he poses a risk to the public. Now, in this context, my client was not doing anything. He was just simply evading them. He made no effort to escape from the scene or to pose a risk of harm to anyone else. And so in our view, that factor weighs against the use of an intermediate level of force. Should the police have tackled him? Yes, absolutely. Is that an intermediate use of force? No, it's not. That's traditional force. That's basically using a means to control somebody who needs to be controlled because he's engaged in conduct for which the police have been called to alleviate a situation. Again, focusing on the pepper spray, isn't a defendant more likely to be injured by being tackled than pepper sprayed? That may be the case, but tackling somebody is not an intermediate level of force. Police are allowed to use physical force to constrain or restrain or push somebody out of the way if that needs to be done. And if that had happened in this case, we wouldn't be here. But that's not what happened. They repeatedly shot him with a pepper spray, repeatedly shot him with a taser, and cumulatively caused his death. It was a homicide, according to the medical examiner. Now, again, each one of those instances... Or simply that he was killed by a person. That's right. That's right. It doesn't say whether it was justifiable. Absolutely. That's a triable issue. We're going to have to try that issue. But what I'm telling you is that not only cumulatively, but each individual act by which a police officer used an intermediate level of force has to be adjudged and evaluated according to the criteria that this court has established. In Matos, with respect to the tasers, in 2011, and in the Headlands case, which I think was 2004, with regard to pepper spray. Headwaters, yeah. Headwaters, excuse me. And there's no doubt whatsoever that these police officers knew or should have known, by virtue of the case law, by virtue of the regulation of the Honolulu Police Department, and theoretically, by virtue of their training, that just because somebody's running around and ignoring their commands, they cannot resort to this level of force. Would it have made a difference if there were traffic moving through the area? I don't think it would have made a difference per se, but it could have if there were specific examples of conduct by Mr. Halleck by which he was endangering those other members of the public. That would perhaps change the calculus, because that again addresses the criteria that are applicable to a situation where this kind of force is used. But there is no example of that. There's not even any example, according to the testimony of the police officers, that they felt that he was threatening or endangering them. One of the officers, the young woman, testified that she was frightened of him because of his size. But you know what? That goes with the job. He did not attempt to hit her. He never did hit her. All he did was evade her and ignore her commands. And again, the testimony will likely be a trial that he wasn't able to comprehend or understand her commands because he was under the influence of drugs and he was mentally ill. But that doesn't entitle the police to resort to this level of force. And no justification or excuse has been given for that whatsoever. Lastly, what I want to suggest to you is you have a suggestion that the Kinsella case recently decided by the Supreme Court and somehow, in some manner, affects this calculus and the way you want to view this case. We disagree strenuously. Kinsella involved a case where a woman had a knife in very close proximity to somebody who the police officer perceived was in danger of being seriously harmed. And the police officer then shot that woman from a distance, nevertheless, but nevertheless used deadly force in that situation. And the Supreme Court said that the officer has qualified immunity. Now, I might prefer the reasoning in that situation and that the analysis go a little deeper, as the two dissenting justices suggested. But there's no way that I could argue with any candor to you that the police officer in that situation acted unreasonably, seeing and perceiving the threat that he saw on that occasion. In this case, those facts have nothing to do with our situation. There was no perceived danger. There was nothing that justified the use of force here for somebody just simply because he was in the roadway. You addressed the Jones case that you're calling. Sure. I would be happy to have you rely on Jones. Because in fact, in Jones, what happened was, yes, this was a traffic stop. Man got out of the car. Police officer felt threatened. The man ran, and then apparently the officer ran him down and tased him. The man was running away, and then he was tased by the police officer. In that case, as I read the case, a panel of this court said that the conduct and the use of the taser was not subject to qualified immunity, and that the force was unreasonable. I don't understand why the city is quoting that case to you, because I think that case is- I take it the city's argument is that may be the law in 2017, but it wasn't the law in when these events occurred. I was looking to see when- Well, and in part, in response to that case, we have cited to you a district court case by which you're not bound. But nevertheless, the Mbegu case from Arizona, which was decided just a few months ago. And I would commend to you the analysis in that case, because I think that case is right on. In every respect, that judge did what a judge ought to do when faced with a motion for summary judgment on these grounds. That case correctly utilized the criteria, which are in existence and have been in existence since the en banc decision of the Ninth Circuit in the Matos case, with regard to the use of tasers. And I think, frankly, that in both Jones and in Matos, they found a violation. In Matos, they just simply found that it wasn't clear that tasers used in that manner were something that the police officer would have known that he shouldn't do. But we've known that now since 2011. And I think, therefore, there's no argument, there's no credible argument here for qualified immunity based on the state of the law. There's no qualified, there's no argument that I think can be justified based upon the criteria for the uses of force repeatedly in this case, and that we ought to, at a minimum, be entitled to address these matters at trial before a jury. Thank you. Thank you. Why don't you put a full minute on the clock? Your Honors, Plaintiff's Counsel cited to Graham, Matos, Headwater, and the supplemental 28J case that he cited. None of those cases established clearly established law in this case. None of those cases put it beyond debate that the force utilized here was excessive. And even if we can see that the roadway is not a factor in this case, what distinguishes the facts in this case is that the officers painstakingly took other, attempted to warn, attempted to give him verbal commands, and he was fleeing. This is not a static case. That's how the court described the facts in the Bryan case. And even in Matos and Brooks, a woman sitting in her car, she's confined in her car, and then in Matos, in the other plaintiff scenario in that case, the other woman is in her house. These are people that are contained. They're not outside. They're not running around. They're not a danger to anyone else. So these officers acted valiantly in attempting everything they could possible. Verbal commands, pepper spray, until they finally had to attempt to use the taser, which we would submit was ineffective. And so for talking about the Jones case, that case, it's almost the exact factual scenario. And to rule against us in this case, this court would have to essentially overturn itself in the Jones case. As to that point where he tasers him when he's fleeing. And I want to be clear. And so what was the holding in the Jones case? In Jones, the court held that it was reasonable for the officer to tase the suspect, misdemeanor, traffic stop suspect, when he attempted to run away from him. There were other things that happened in that case because, and I'm out of time, but there were other things that happened. Mr. Magistrate, do you have a citation to that Jones case? Because I think I just heard the holding described the opposite way. I think the discrepancy is that there were other things that happened subsequent to the facts that I argued. The court said that at that point, to the point in the interaction with the officers, that that conduct of to tase him at that point was reasonable. Subsequent to that, there were other officers that arrived, multiple officers tasing him for over 90 seconds nonstop, 90 seconds. And I think it was multiple, like some using drive stun. That's why it was unreasonable in that case, after the initial tasing. And I do have the cite. Do you want the cite? Yes, please. It's 873 F3rd 1123. And this is a Ninth Circuit opinion from 2017. I'm sorry. The mic kind of muffles your sound. Say it again. So slowly. 873. 873. Okay. F3rd 1123. 1123. And the portion we're citing is actually at 1130 specifically. Can I come back to the question about differentiation of two different kinds of force? Is it your position that we should not distinguish between the use of taser and the use of pepper spray in this case? Or that we should distinguish? I think that if the court is going to, you know, if the court takes your view that this is a... But I'm asking your... Potentially lethal. Absolutely. If you... Then you would have to, you know, distinguish between, yeah, pepper spray and a taser. But if you're talking about the actions of the individual officers, yes, absolutely. I mean, the officers that only use pepper spray should be delineated from the officer that deployed a taser. Okay. And there is different case law. But, you know, it's conflicting. I mean, some courts say it's intermediate level. And then some opinions, right. They only focus on taser cases for fact patterns with tasers. So it is conflicting in that respect. Okay. Thank you. Thank you very much. Thank both sides for your arguments. Silva versus Chung, a minute for decision.
judges: Tashima, W. Fletcher, Hurwitz